UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA WILLIAMS, *et al*,                           Case No. 13-10817

         Plaintiffs,                                Sean F. Cox
v.                                                   United States District Judge

SAXON MORTGAGE SERVICES, INC,                        Michael Hluchaniuk
                                                     United States Magistrate Judge
         Defendant.
_____/

## REPORT AND RECOMMENDATION
## <u>DEFENDANT'S MOTION TO DISMISS (Dkt. 6)</u>

## I.    PROCEDURAL HISTORY

On February 28, 2013, plaintiffs Rebecca and Stephen Williams and

Douglas Ellman, United States Bankruptcy Panel Trustee, filed this putative class

action suit against defendant Saxon Mortgage Services, Inc. ("Saxon" or

"defendant"), on behalf of themselves and similarly-situated Michigan

homeowners "who have been wrongfully denied a permanent modification of their

mortgages by" Saxon.  (Dkt. 1).[1]  Plaintiffs assert four causes of action against

Saxon: (1) breach of contract/breach of the duty of good faith and fair dealing; (2)

---

[1] Plaintiffs had filed an action against Saxon nearly identical to the instant action on September 12, 2011.  Saxon moved to dismiss that case, in part for lack of standing because it argued that the claims belong to plaintiffs' Chapter 7 bankruptcy estate.  Plaintiffs subsequently voluntarily dismissed that complaint without prejudice.  (Dkt. 6-10).  Plaintiffs then moved to re-open their Chapter 7 case and amended their schedules to include the dismissed claims against Saxon.  (Dkt. 1, ¶ 77).  The bankruptcy Trustee is now a party to this case.

promissory estoppel; (3) violations of the Michigan Consumer Practices Act

("MCPA"); and (4) violation of the Fair Debt Collection Practices Act

("FDCPA").  (*Id.*).  Defendant filed a motion to dismiss in lieu of an answer on

June 7, 2013.  (Dkt. 6).  On July 10, 2013, plaintiffs filed a response to defendant's

motion (Dkt. 11, 12),[2] and defendant filed a reply brief in support of its motion on

August 9, 2013.  (Dkt. 13).  On August 23, 2013, plaintiffs filed a notice of

supplemental authority in opposition to defendant's motion to dismiss.  (Dkt. 15).

The parties filed their joint statement of resolved and unresolved issues on

September 19, 2013.  (Dkt. 19).  Defendant's motion to dismiss motion was

referred to the undersigned on June 11, 2013.  (Dkt. 7).  Pursuant to notice, a

hearing was held on this matter on October 16, 2013.  (Dkt. 16).  This motion is

now ready for report and recommendation.

 For the reasons set forth below, the undersigned **RECOMMENDS** that

defendant's motion to dismiss be **GRANTED in part** and **DENIED in part**.

## II. BACKGROUND

### A. The Home Affordable Modification Program

 In February 2009, the Secretary of the Treasury and the Director of the

Federal Housing Finance Agency announced the Making Home Affordable

---

 [2] On September 4, 2013, plaintiffs filed a corrected response brief (in 14-point font, as required by E.D. Mich. L.R. 5.1(a)(3), as amended on July 1, 2013).  (Dkt. 18).

program (the "MHA"), an effort to stem the foreclosure process.  As part of the

MHA, the Home Affordable Modification Program ("HAMP") was created.

HAMP is a federal program designed to assist homeowners in avoiding

foreclosure by offering lenders incentives to offer borrowers modifications with

more favorable terms.  Pursuant to HAMP, the Secretary of the Treasury

negotiates Servicer Participation Agreements (SPAs) with servicers, such as

Saxon, which require servicers to identify eligible homeowners who are in default

or will likely soon default and to modify the terms of their loans.  Saxon entered

into a Servicer Participation Agreement with Fannie Mae in which Saxon agreed

to apply the Treasury Department's HAMP criteria to all of the loans it services.

(Dkt. 6-3).  The HAMP guidelines specify that a servicer follows three steps to

determine whether a homeowner is eligible for a modification.  First, the servicer

determines whether the borrower meets certain threshold requirements.  Second,

the servicer applies various changes in order to lower the monthly mortgage

payment as close as possible to 31 percent of the borrower's monthly income.

Finally, applying a net present value test, the servicer determines whether it is

more profitable for the lender to modify the loan or to go into foreclosure.

Before a borrower receives a permanent modification, a loan servicer and a

borrower enter into a three-month trial period, during which the borrower makes

lower monthly payments towards their mortgage.  The terms of the trial period are

governed by a form contract entitled "HAMP TPP" (the "TPP").  The TPP states that the Lender will send the borrower a permanent modification agreement if: (1) the borrower's representations of their financial state continue to be true; (2) the borrower complies with the terms of the temporary payment program; (3) the borrower provides all required documentation; and (4) the Lender determines that the borrower qualifies.  As part of this process, the servicer offers the borrower a two-step TPP.  The first step is a trial payment period, usually lasting three months, during which the borrower provides loan modification documentation to the lender and makes trial payments under the new loan repayment terms.  The second step of the process is a permanent modification, which occurs if the borrower makes all of the payments in the modified amounts and complies with all of the requirements of the TPP.

### B.    Plaintiffs' Complaint

According to plaintiffs' complaint, defendant Saxon was the servicer of plaintiffs' home loan made on December 6, 2004.  (Dkt. 1, ¶ 51).  Plaintiffs began experiencing difficulty making their regular monthly mortgage payment in March 2008, and sought a HAMP modification of their mortgage with Saxon in May 2009.  (*Id.* ¶¶ 52-53).  In support of their application, plaintiffs sent Saxon a package containing all requested financial information and documents, including plaintiffs' Hardship Affidavit.  (*Id.* ¶ 53).  After receiving plaintiffs' financial

4

documents, Saxon sent plaintiffs a loan modification package, including a

proposed Trial Period Plan ("TPP") Contract for the August 1st through October

30, 2009 trial period. (Dkt. 1 ¶ 54; Dkt. 1-1, TPP). Plaintiffs assert they were

prequalified for their TPP contract on the basis of verified financial information

and that they "accepted Saxon's offer by executing the TPP Contract" and

returning it to Saxon. (*Id.* ¶¶ 55-56). On August 28, 2009, Saxon countersigned

the contract as "attorney-in-fact" for the lender, "The Bank of New York Mellon,"

and returned the TPP Contract to plaintiffs. (*Id.* ¶ 57). The TPP Contract

provided: "I understand that after I sign and return two copies of this Plan to the

Lender, the Lender will send me a signed copy of this Plan *if I qualify for the Offer*

or will send me written notice that I do not qualify for the offer." (*Id.* ¶ 59; Dkt. 1-

1, TPP ¶ 2 (emphasis added)). Plaintiffs assert they fully performed their

obligations under the TPP and that they remained qualified for a permanent

modification, but that Saxon failed to offer them a permanent loan modification

and failed to provide written notice of their ineligibility prior to the expiration of

the trial period. (Dkt. 1, ¶¶ 61-62, 65). Saxon instead informed plaintiffs on May

6, 2010 that they were approved for a "Saxon Alternative Modification." (*Id.*

¶ 67). Plaintiffs called Saxon in July 2010 to inquire about the status of their

modification and were told that they were not approved for a HAMP modification.

(*Id.* ¶ 68). Plaintiffs continued to make modified payments and by August 2010,

plaintiffs had made a total of $12,338.28 in modified payments, which Saxon

placed in an unapplied funds account rather than applying the funds to pay the

principal and interest on plaintiffs' mortgage.  (*Id.* ¶ 69).  Saxon subsequently sent

plaintiffs a Saxon Alternative Loan Modification Agreement in October 2010.  (*Id.*

¶¶ 67, 70).  The terms of this modification agreement were markedly inferior to a

HAMP modification and provided only a small reduction in plaintiffs' monthly

payment, which was inadequate to remedy plaintiffs' financial hardship.  (*Id.*

¶ 70).

Plaintiffs allege that because the terms of the alternative agreement were not

adequate, they reluctantly filed Chapter 7 bankruptcy on October 19, 2010.  (Dkt.

1, ¶ 71).  The bankruptcy was discharged on January 20, 2011, exempting

plaintiffs' mortgage, and the case was closed on March 28, 2011.  (*Id.* ¶ 71).

Saxon then began foreclosure proceedings against plaintiffs, with notice of

foreclosure dated March 24, 2011.  (*Id.* ¶ 72).[3]  On September 21, 2011, the

Williams plaintiffs filed an action against Saxon, similar to the instant case.  After

Saxon moved to dismiss for lack of standing, plaintiffs voluntarily dismissed the

complaint (Dkt. 6-10), and moved to re-open their Chapter 7 case and amend their

---

[3] Plaintiffs allege that they were advised by letter dated April 21, 2011 that the servicing of their mortgage was being transferred from Saxon to Ocwen Financial Corporation ("Ocwen"), effective May 16, 2011.  (Dkt. 1, ¶ 75).  Plaintiffs applied to Ocwen for an in-house loan modification, which Ocwen subsequently denied, claiming that plaintiffs were not qualified for a modification because they have a "conventional loan."  (*Id.* ¶ 76).  Plaintiffs have not asserted any claims against Ocwen in this case.

6

schedules to include the dismissed claims against Saxon.  (Dkt. 1, ¶ 77).  The

bankruptcy court authorized the bankruptcy trustee, Mr. Ellman, to retain

plaintiffs' attorney as special counsel, and the Trustee is now part of the instant

action against Saxon.  (*Id.* ¶¶ 9, 78).  Plaintiffs filed for Chapter 13 bankruptcy on

May 15, 2011, in an attempt to forestall the foreclosure, and plaintiff's bankruptcy

plan was confirmed on December 19, 2011.  (Dkt. 73).  On February 28, 2013,

plaintiffs filed the instant action against defendant Saxon, asserting claims for

breach of contract/breach of the duty of good faith and fair dealing, promissory

estoppel, violations of the MCPA, and violation of the FDCPA.  (Dkt. 1).

Plaintiffs have subsequently conceded that their FDCPA claim should be

dismissed.  (Dkt. 18, Pg ID 419).

## III.   ANALYSIS AND CONCLUSIONS

### A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case

where the complaint fails to state a claim upon which relief can be granted.  When

reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the

complaint in the light most favorable to the plaintiff, accept its allegations as true,

and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v.*

*Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true

legal conclusions or unwarranted factual inferences."  *Id.* (quoting *Gregory v.*

*Shelby Cnty. Tenn.*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions

masquerading as factual allegations will not suffice."  *Eidson v. State of Tenn.,*

*Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

        In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court

explained that "a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do.  Factual allegations must

be enough to raise a right to relief above the speculative level. . . ."  *Id.* at 555

(internal citations omitted).  Dismissal is appropriate if the plaintiff has failed to

offer sufficient factual allegations that make the asserted claim plausible on its

face.  *Id.* at 570.  The Supreme Court clarified the concept of "plausibility" in

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009):

> To survive a motion to dismiss, a complaint must contain
> sufficient factual matter, accepted as true, to "state a
> claim to relief that is plausible on its face."  A claim has
> facial plausibility when the plaintiff pleads factual
> content that allows the court to draw a reasonable
> inference that the defendant is liable for the misconduct
> alleged.  The plausibility standard is not akin to a
> "probability requirement," but it asks for more than a
> sheer possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are "merely
> consistent with" a defendant's liability, it "stops short of
> the line between possibility and plausibility of
> 'entitlement to relief.'"

*Id.* at 678 (internal citations to *Twombly* omitted).  A plaintiff's factual allegations,

while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original, citing *Twombly*, 550 U.S. at 555). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 550 U.S. at 562).

In ruling on a motion to dismiss, the Court "may consider only matters properly part of the complaint or pleadings" in deciding the merits of the motion. *Armengau v. Cline*, 7 Fed. Appx. 336, 344 (6th Cir. 2001) (citations omitted). The Sixth Circuit "takes a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Id.* Thus, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, (3) documents that are a matter of public record, and (4) letters that constitute decisions of a government agency. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *see also Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written

agreement, and plaintiff fails to attach the written instrument, "the defendant may

introduce the pertinent exhibit," which is then considered part of the pleadings.

*QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp.2d 718, 721 (E.D. Mich. 2003).

"Otherwise a plaintiff with a legally deficient claim could survive a motion to

dismiss simply by failing to attach a dispositive document." *Weiner v. Klais &*

*Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

### B.   The Williams Plaintiffs' Standing to Proceed

Saxon argues that the Williams plaintiffs should be dismissed from this

action because: (1) they lack standing to proceed in this action because the

bankruptcy Trustee is the real party in interest who has exclusive standing to bring

claims on behalf of the estate; and (2) the Williams plaintiffs are judicially

estopped from proceeding as a result of their failure to disclose their claims to the

court presiding over their Chapter 13 bankruptcy.  Plaintiffs respond that the

Williamses can proceed as co-plaintiffs with the Trustee, and that they should not

be judicially estopped from proceeding because their non-disclosure of the claim

to the bankruptcy court was inadvertent and not inequitable to Saxon.

### 1.   The Williams plaintiffs lack standing

Saxon argues that the bankruptcy Trustee is the sole proper plaintiff in this

matter and the claims of the Williams plaintiffs should be dismissed because those

plaintiffs lack standing.  Plaintiffs argue that the Williamses can continue as "co-

plaintiffs" with the bankruptcy Trustee, but cite no authority for that proposition. Rather, the law is well-settled that when the bankruptcy estate is part of a Chapter 7 case, the bankruptcy trustee has the sole power to pursue pre-petition claims, and "[t]he debtor has *no standing* to pursue such [the estate's] causes of action." *See Bauer v. Commerce Union Bank*, 859 F.2d 438, 440-42 (6th Cir. 1988) (emphasis added); *see also Currithers v. FedEx Ground Package Sys., Inc.*, 2012 WL 380146, at *7 (E.D. Mich. Feb. 6, 2012) ("Assets of the bankruptcy estate are within the *sole* control of the trustee, the *only party* with standing to maintain actions related to such assets.") (emphasis added, citations omitted).  This is because, when an individual files for bankruptcy, "[t]he Bankruptcy Code . . . provides that the bankruptcy estate comprises 'all legal or equitable interests of the debtor in property as of the commencement of the case[.]" *Bauer*, 859 F.2d at 440-41.  These property interests include all causes of action that can be brought by the debtor, such as those in this case.  *Id.* at 441.  Accordingly, the Williams plaintiffs have no standing to proceed as plaintiffs or co-plaintiffs in this action and should be dismissed.  *See Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 905-06 (6th Cir. 2012) (ordering that the district court could allow Auday to amend the complaint to *substitute*, not add, the Trustee as the plaintiff); *see also Auday v. Wetseal Retail, Inc.*, 2013 WL 2457717, at *9 (E.D. Tenn. June 6, 2013) (ordering that trustee be substituted into case, and denying plaintiffs' request to join the trustee

as a party).[4]

## 2.   Judicial Estoppel

Saxon also argues, in the alternative, that even if plaintiffs retained any claims against Saxon following their Chapter 7 bankruptcy, they would be judicially estopped from pursuing those claims here.  Plaintiffs failed to identify any potential claims against Saxon when they initially petitioned under Chapter 7 and, as of the date of their motion–over 20 months after filing their initial suit and 8 months after reopening their Chapter 7 bankruptcy–plaintiffs still have not informed the court overseeing their Chapter 13 bankruptcy or creditors about any potential or existing claims against Saxon.  Plaintiffs argue in response that their non-inclusion of this potential claim in their Chapter 7 bankruptcy filing was a result of inadvertence and should be excused.  Plaintiffs further argue that the two bankruptcy filings are pending before the same judge, and thus plaintiffs' notice to the Court in the Chapter 7 proceedings constitutes notice in the Chapter 13

---

[4] Saxon argues, and the undersigned agrees, that plaintiffs did not retain any claims against Saxon following their Chapter 7 bankruptcy, when they filed for Chapter 13 bankruptcy. In any event, although the Sixth Circuit has not expressly addressed the issue, some district courts within the Sixth Circuit Court of Appeals, and all other Circuit Courts of Appeal to consider the issue, have held that a *Chapter 13 debtor* may bring claims in their own names on behalf of the estate.  *See e.g., Epps v. United States*, 2013 WL 4096001, at *3 (W.D. Tenn. Mar. 27, 2013) (collecting cases supporting holding that Chapter 13 debtor retains standing to pursue prepetition claims); *Boddie v. PNC Bank, NA*, 2013 WL 443773, at *4 (S.D. Ohio Feb. 5, 2013) (Chapter 13 debtor/plaintiff has standing to bring suit on behalf of the estate).  However, as explained below, plaintiffs' initial failure to disclose this claim in their Chapter 7 bankruptcy filing and continuing failure to disclose this claim in their Chapter 13 bankruptcy filing, which includes some different creditors, would judicially estop the Williamses, but not the Trustee, from proceeding here.

12

proceedings.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations omitted).  The purpose of the doctrine of judicial estoppel is to "preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002).  The Supreme Court has identified three considerations that are typically relevant in determining whether judicial estoppel should apply:

> (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*New Hampshire*, 532 U.S. at 750-51 (internal quotations and citations omitted).  However, these elements are not "inflexible prerequisites or an exhaustive formula" for judicial estoppel, and additional considerations may inform applicability in certain factual contexts.  *Id.* at 751.

In the bankruptcy context, the Sixth Circuit has stated that in order to

13

support a finding of judicial estoppel, the court must find that (1) the plaintiff

assumed a position that was contrary to the one that he asserted under oath in the

bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position

either as a preliminary matter or as part of a final disposition; and (3) the

plaintiff's omission did not result from mistake or inadvertence. *White v.*

*Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 478 (6th Cir. 2010). As

explained above, a debtor has an affirmative duty to disclose all of his assets to the

bankruptcy court, *Browning*, 283 F.3d at 775 (citing 11 U.S.C. § 521(1)), and in

the Sixth Circuit, it is well-established that a cause of action is an asset that must

be scheduled under § 521. *See White*, 617 F.3d at 479 n.5; *Lewis v. Weyerhaueser*

*Co.*, 141 Fed. Appx. 420, 424 (6th Cir. 2005); *Eubanks v. CBSK Fin. Grp.*, 385

F.3d 894, 897 (6th Cir. 2004). In addition, "the duty of disclosure is a continuing

one, and a debtor is required to disclose all potential causes of action." *Lewis*, 141

Fed. Appx. at 424 (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5thCir.

1999)) (internal quotations omitted); *see also Kimberly v. Dollar General Corp.*,

520 Fed. Appx. 312, 315 (6th Cir. 2013) (finding debtor had duty to disclose a

potential claim arising from her employment termination, which occurred forty-

one days after her final payment into her bankruptcy plan); *Bartlett v. Ohio Nat'l*

*Fin. Servs.*, *Inc.*, 2013 WL 394381, at *3 (S.D. Ohio Jan. 31, 2013) (applying

judicial estoppel for failure to disclose when plaintiff filed a civil suit one month

after bankruptcy court discharged debt because plaintiff had received right to sue letter from EEOC 88 days earlier).  While the doctrine of judicial estoppel might yield harsh results, *White*, 617 F.3d at 486-87 (Clay, J. dissenting), it has been consistently applied in the Sixth Circuit to bar a plaintiff from prosecuting a cause of action which he has omitted from his Chapter 13 bankruptcy petition.  *See, e.g., id.* at 482.

The undersigned first notes that Saxon's estoppel arguments do not apply to the bankruptcy Trustee, who may bring the instant claims for the benefit of plaintiffs' bankruptcy estate.  *See Stephenson v. Malloy*, 700 F.3d 265, 272 (6th Cir. 2012) (holding "that Al-Mansoob's failure to disclose his claims [on his bankruptcy filings] does not bar the trustee from pursuing them.").  The Sixth Circuit has held that pursuing a cause of action not disclosed as an asset in a bankruptcy proceeding creates an inconsistency sufficient to support judicial estoppel as the debtor has already asserted the position that no such claims existed.  *See Eubanks*, 385 F.3d at 898; *Browning*, 283 F.3d at 775.  Thus, "[i]t is undisputed that, by omitting any reference of the [instant] claim in [their] Schedule B and Statement, in this instant case, [plaintiffs] 'assumed a position that was contrary to the one that [they] asserted under oath in the bankruptcy proceedings,' and that by confirming [their] plan, 'the bankruptcy court adopted the contrary position.'" *Payne v. Central Defense Servs., Inc.*, 2013 WL 3974575, at *6 (W.D.

15

Tenn. Aug. 2, 2013) (quoting *White*, 617 F.3d at 478); *see also Epps*, 2013 WL 4096001, at *4 ("Courts presume a debtor in bankruptcy has a motive to conceal assets.") (citing *Lewis*, 141 Fed. Appx. at 426 ("It is always in a Chapter 13 petitioner's interest to minimize income and assets.")).

Plaintiffs do not dispute that their Chapter 7 bankruptcy filing did not initially include the pending claims and that their Chapter 13 bankruptcy filing does not list the pending claims, but only argue that any error was due to their inadvertence. A debtor's omission may be deemed inadvertent in two circumstances: (1) where the debtor lacked knowledge of the undisclosed claims; and (2) where the debtor had no motive for concealment. *Browning*, 283 F.3d at 776. The courts also look at whether the evidence indicates an absence of bad faith. *See Epps*, 2013 WL 4096001. It is the plaintiff's burden to present evidence establishing the absence of bad faith. *Payne*, 2013 WL 3974575. Regarding inadvertence, "[t]he debtor need not know all the facts or even the legal basis for the cause of action rather, if the debtor has enough information . . . to suggest that it may have a possible cause of action, then it is a 'known' cause of action such that it must be discharged." *In re Coastal Plains*, 179 F.3d at 210. Here, plaintiffs had knowledge of the factual basis of their claims before they petitioned the bankruptcy court because they argued that the failure to modify their loan caused their bankruptcy. (Dkt. 1, ¶¶ 71-73, 77). Further, it can be presumed

16

that plaintiffs had a motive to conceal their claim, "because if the claim became part of [their] bankruptcy estate, then the proceeds from it could go towards [their] creditors." *Payne*, 2013 WL 3874575, at *6 (citing *Lewis*, 141 Fed. Appx. at 426 ("It is always in a Chapter 13 petitioner's interest to minimize income and assets.")). As the *Payne* court explained, "even if Payne had informed his bankruptcy attorney of his lawsuit, judicial estoppel would still apply to bar his claim." *Id.* at *3 n. 2. The fact that plaintiffs reopened and amended their Chapter 7 filings does not preclude dismissal based on judicial estoppel. *See id.* at *7; *see also Maxwell v. MGM Grand Detroit, LLC*, 2007 WL 2050795, at *7 (E.D. Mich. July 16, 2007) (collecting cases). Simply put, an "after-the-fact effort to amend is insufficient to show a lack of bad faith." *Payne*, 2013 WL 3874575, at *7 (citing *White*, 617 F.3d at 481 ("We will not consider favorably the fact that White updated her initial filings after the motion to dismiss was filed. To do so would encourage gamesmanship, since White only fixed her filings after the opposing party pointed out that those filings were inaccurate.")); *see also Maxwell*, 2007 WL 2050795 (applying judicial estoppel to dismiss plaintiffs' claims despite plaintiffs' petitions to reopen their bankruptcy cases and amend their schedules and financial statements). Accordingly, the Williams plaintiffs should be dismissed as parties to this lawsuit and the bankruptcy Trustee, Ellman, should proceed as the only named plaintiff to this action.

**C.    Count I - Breach of Contract/Breach of Duty of Good Faith and Fair Dealing**

Plaintiffs allege that they entered into a written TPP Contract with Saxon, and that Saxon breached the contract by failing to offer permanent HAMP modifications or providing plaintiffs with timely written notification denying them a HAMP modification.  (Dkt. 1, ¶ 106).  Specifically, plaintiffs allege that Saxon breached the TPP Contract by, among other things: (1) failing to evaluate plaintiffs' demonstrated qualifications within the term of the TPP Contract; or (2) failing to offer plaintiffs a permanent modification within the period required by the TPP Contract; or (3) failing to provide plaintiffs a timely written notice of denial explaining why Saxon believed that plaintiffs did not qualify.  (*Id.* ¶ 65).

The TPP at issue provides, in relevant part:

> If I am in compliance with this Trial Period Plan ("TPP") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3 . . .
>
> \* \* \*
>
> I understand that after I sign and return two copies of this Plan to the Lender, *the Lender will send me a signed copy of this Plan if I qualify for the Offer* or will send me written notice that I do not qualify for the Offer.  This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

(Dkt. 1-1, Intro) (emphasis added).

> If prior to the Modification Effective Date, (I) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period Payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate. . . .

(*Id.* ¶ 2.F.)

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (I) I meet all the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan. . . . .

(*Id.* ¶ 2.G.).

> . . . . If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, *the Lender will send me a Modification Agreement for my signature* which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date. . . .

(*Id.* ¶ 3) (emphasis added).

### 1. Plaintiff's breach of contract claim is not precluded as a "back-door effort" to enforce HAMP

Saxon argues that plaintiffs' breach of contract claim should be dismissed as a back door effort to enforce compliance with HAMP, which does not provide a private cause of action. Saxon argues that because the TPP is a part of HAMP, the TPP cannot form the basis of a state-law breach of contract claim. Saxon's argument is not convincing, and the courts in this district and elsewhere have rejected this contention. *See e.g.*, *Bolone v. Wells Fargo Home Mortg., Inc.*, 858 F. Supp.2d 825, 831 (E.D. Mich. 2012) (holding that HAMP does not preempt plaintiff's state law breach of contract claim based on a TPP); *see also Brady v. Chase Home Fin., LLC*, 2012 WL 1900606, at *3 (W.D. Mich. May 24, 2012) (agreeing with those courts "that have found that the lack of private right of action under HAMP does not preclude[] a plaintiff from maintaining a breach of contract claim based on a TPP.") (citations omitted); *Helmus v. Chase Home Finance, LLC*, 890 F. Supp.2d 806, 812 (W.D. Mich. 2012) (lack of private right of action under HAMP did not preclude borrowers from maintaining a breach of contract claim against mortgage loan servicer premised on a TPP, a HAMP-related document). In *Wigod v. Wells Fargo Bank*, *N.A.*, 673 F.3d 547 (7th Cir. 2012), the Seventh Circuit considered and rejected this same argument, noting that "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim

20

under a state law just because it refers to or incorporates some element of the federal law." *Id.* at 581; *see also Cave v. Saxon Mortg. Servs., Inc. (Cave II)*, 2013 WL 1915660, at *4 n. 3 (E.D. Pa. May 9, 2013) ("it is inconsequential" to plaintiff's breach of the TPP contract claim "that HAMP affords no private right of action"). The undersigned agrees with those courts that have considered and rejected Saxon's argument and found that the lack of private right of action under HAMP does not preclude a plaintiff from maintaining a breach of contract claim based on a TPP. *See Bolone*, 2012 WL 882894, at *4; *Brady*, 2012 WL 1900606, at *3.[5]

Saxon further argues that it is not a proper party for plaintiff's breach of contract claim because, it contends, the TPP provides that it is between "Borrower," "Stephen Williams and Rebecca R. Williams," and the "Lender," "The Bank of New York Mellon," and Saxon only signed the agreement as "attorney-in-fact" for the Lender. Plaintiffs here did not bring their claims against

---

[5] Saxon also argues that the Trustee seeks to hold Saxon liable for damages flowing from plaintiffs' failure to qualify for government benefits administered by Saxon, which amounts to suing a government contractor for following directives issued by the United States. Saxon argues it is entitled to immunity because a "private contractor [which] is compelled by a contract to perform an obligation for the United States" may "share the sovereign immunity of the United States." *Carley v. Wheeled Coach*, 991 F.2d 1117, 1120 (3d Cir. 1993). However, as plaintiffs point out, Saxon fails to provide any authority to support this novel argument, and the undersigned has found none. Rather, the TPP is a private contract between the borrower and servicer. *See Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp.2d 172, 183 (D. Mass. 2011) ("A TPP is a contract between a homeowner and a mortgage servicer."). Therefore, this argument fails and should be denied.

the Lender, only Saxon, alleging that they entered into a written TPP with Saxon.

(Dkt. 1, ¶¶ 28-34, 47, 50-60).  Plaintiffs respond that Saxon should be estopped to

deny that it is a party to the TPP based on its conduct (i.e., its communications

with plaintiffs in entering the TPP), and based on Saxon entering the SPA with

Fannie Mae, where it agreed to be the party to the TPPs.  Plaintiffs assert that the

federal program directed servicers to sign TPPs, and any other reading of the TPPs

would render them void.  Case law supports plaintiffs' argument, providing that

"[a] TPP is a contract between a homeowner and a mortgage servicer." *See*

*Markle*, 844 F. Supp.2d at 183 ("As a party to the contract, the homeowner has

standing to seek enforcement of contractual promises made by the servicer, so

long as enforcement is compatible with the objectives of HAMP."); *see also Cave*

*v. Saxon Mortg. Servs., Inc. (Cave I)*, 2012 WL 1957588, at 7 (E.D. Pa. May 30,

2012) ("[W]e conclude that the TPP is an enforceable contract.  Under its plain

terms, the TPP obligated Saxon [the servicer] to provide Plaintiffs with a

permanent modification if Plaintiffs qualified, or send Plaintiffs a written denial if

they did not qualify."); *see also Nash v. Green Tree Servicing, LLC*, 943 F.

Supp.2d 640, 646 (E.D. Va. 2013) (plaintiff alleged a legally enforceable

obligation of the defendant servicer to plaintiff by stating that the servicer sent

22

plaintiff the TPP application, stating "Let us know if you accept this offer.").[6]

Further, under HAMP, the mortgage servicer is the party that conducts the loan

modification with the borrower, and determines borrower eligibility for a

modification, not the Lender.  (Dkt. 6-2, SD 09-01).  Here, it is undisputed that

Saxon sent the TPP to plaintiffs, stating "If you qualify under the federal

government's Home Affordable Modification Program and comply with the terms

of the Trial Period Plan, we will modify your mortgage loan and you can avoid

foreclosure," and asking plaintiffs to "[p]lease let us know no later than August 1,

2009 that you accept the Trial Period Plan."  (Dkt. 6-4, Pg ID 144).  It is also

undisputed that Saxon, not the Lender, signed the Servicer Participation

Agreement ("SPA") with Fannie Mae authorizing it to offer loan modifications to

borrowers (Dkt. 6-3, Pg ID 141), and the plaintiffs submitted their Hardship

Affidavit to Saxon "[i]n order to qualify for Saxon Mortgage Services, Inc.'s

("Servicer") offer to enter into an agreement to modify [plaintiffs'] loan under the

federal government's Home Affordable Modification Program (the

'Agreement').").  (Dkt. 6-16, Pg ID 293).  Accordingly, the undersigned concludes

that plaintiff has sufficiently alleged that Saxon is a proper party to plaintiffs'

_____

[6] The one case Saxon relies on in support of its argument, *Gilchrist v. Saxon Mortg. Servs.*, 2013 WL 1091112 (Ohio Ct. App. Mar. 14, 2013), is a state law case not controlling on this Court and is distinguishable as that case was decided based expressly on Ohio state law, not federal law, and specifically on R.C. 1337.092(A), which governs contracts entered into in a representative capacity under Ohio law.

breach of contract claim.  *See Markle*, 844 F. Supp.2d at 183.

### 2.    Plaintiffs have sufficiently pleaded an offer to support their breach of contract claim

For plaintiffs to state a breach of contract claim under Michigan law, they must establish the essential elements of a valid contract: (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.  *Yates v. U.S. Bank Nat'l Ass'n*, 912 F. Supp.2d 478, 486 (E.D. Mich. 2012) (citing *Hess v. Cannon Twp.*, 265 Mich. App. 582, 592; 696 N.W.2d 742 (2005)).  Then, plaintiffs must show: (1) the terms of the contract, (2) a breach of one or more of those terms by defendant, and (3) injury to plaintiffs caused by defendant's breach.  *Id.* (citation omitted).

Plaintiffs allege that they entered into a written TPP Contract with Saxon and that Saxon breached the contract by failing to offer plaintiffs a permanent HAMP modification or by failing to provide plaintiffs with a timely written notification denying them a HAMP modification.  (Dkt. 1, ¶ 106).  Saxon argues that it did not have a contractual obligation to provide plaintiffs a permanent HAMP modification because it was entitled to review plaintiffs' submissions and either approve or deny the requested permanent loan modification after receiving that information, *citing Polk v. Countrywide Fin. Corp.*, 2012 WL 2952389 (E.D. Mich. July 19, 2012), and *Pennington v. HSBC Bank USA*, 493 Fed. Appx. 548

24

(6th Cir. 2012), *cert. denied*, 133 S. Ct. 1272 (2013).  Defendants argue that plaintiffs fail to allege that they satisfied the eligibility and underwriting criteria required for permanent modification, but only suppose that they were qualified because they received a TPP and made the reduced payments required.  Rather, Saxon argues, plaintiffs must allege that they satisfied the HAMP eligibility and underwriting criteria that constitute express preconditions to permanent modification under the program.  Saxon further argues that it did not have a contractual obligation to provide plaintiffs with a written denial letter.  Plaintiffs respond that the TPP is an unambiguous offer to modify their mortgage.  Plaintiffs argue that they adequately alleged their acceptance of Saxon's offer by signing the TPP and by their performance under the TPP in making the required payments.  Further, the TPP was countersigned by Saxon, which plaintiffs argue demonstrates that Saxon found plaintiffs qualified for a permanent modification.

The undersigned agrees with plaintiffs that they have sufficiently alleged that the TPP here is an enforceable contract whose plain terms obligate Saxon to provide plaintiffs with a permanent loan modification if plaintiffs qualified, or to send plaintiffs a written denial if they did not qualify.  Plaintiffs allege that they were prequalified for a loan modification on the basis of verified financial information (Dkt. 1, ¶ 55), and that they performed all of their obligations under the TPP Contract, including making all payments due on time and providing

25

additional copies of previously supplied documents that were requested by Saxon. (*Id.* ¶ 61).  Plaintiffs further allege that they remained qualified for a permanent modification throughout the term of the TPP by, among other things, complying with the TPP Contract and all applicable HAMP rules and guidelines, and that all representations they made in support of their HAMP application remained true and correct.  (*Id.* ¶ 62).  Plaintiffs state that Saxon countersigned and returned the TPP because it determined plaintiffs qualified for a loan modification.  (*Id.* ¶¶ 59-60, 64).

It is significant in this case that the TPP was countersigned by Saxon and returned to plaintiffs, because that indicates, per the express language in the TPP, that Saxon determined that plaintiffs qualified for the offer of a loan modification. (Dkt. 1-1 ("I understand that after I sign and return the two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan *if I qualify for the Offer . . . .*") (emphasis added).[7]  As the court recognized in *Brady v. Chase Home*

---

[7] Saxon argues that the HAMP guidelines allowed servicers to offer trial plans before verifying the borrower's eligibility, and thus plaintiffs' arguments that they were prequalified for a modification fail.  However, while the Treasury Directive does provide that "[s]ervicers may use recent verbal financial information to prepare and offer a Trial Period Plan," and "[s]ervicers are not required to verify financial information prior to the effective date of the trial period," (Dkt. 6-2, Pg ID 107), that Directive also provides that "[u]pon receipt of the Trial Period Plan from the borrower, the servicer must confirm that the borrower meets the underwriting and eligibility criteria.  *Once the servicer makes this determination and has received good funds for the first month's trial payment, the servicer should sign and immediately return an executed copy of the Trial Period Plan to the borrower*." (Dkt. 6-2, pg ID 105 (emphasis added)).  Thus, Saxon's signature on and return of an executed copy of the TPP to plaintiffs here indicated that Saxon "confirm[ed] that [plaintiffs met] the underwriting and eligibility criteria" for a loan modification  *Id.*

*Fin., LLC*, 2012 WL 1900606 (W.D. Mich. May 24, 2012), "because the TPP warns the recipient that it 'will not take effect unless and until both [the borrowers] and the Lender sign it and the Lender provides [the borrower] with a copy of this Plan with the Lender's signature,' no offer is extended until the lender provides the borrower a copy with the lender's signature.  By providing an executed copy to the borrower, the lender extends an offer and must provide a modification if the borrower complies with her obligations.  Conversely, no offer exists if the lender fails to provide the borrower a signed copy."  *Id.* at *7 (alternations in original); *cf. Goss v. ABN AMRO Mortg. Grp.*, — Fed. Appx. —, 2013 WL 6698041, at *5 (6th Cir. Dec. 20, 2013) (holding the TPP was not a binding contract because it was not signed by CMI, and "[b]y its plain terms, the TPP made clear that it is not binding until signed by CMI," distinguishing *Wigod*). In other words, the lender's signature "is a further manifestation of assent required by the Lender for there to be a valid offer."  *Rummel v. Vantium Capital, Inc.*, 2012 WL 2564846, at *7 (E.D. Mich. July 2, 2012) (citing *Wigod*, 673 F.3d at 561 (observing that "when Wells Fargo executed the TPP, its terms included a unilateral offer to modify Wigod's loan conditional on her compliance with the stated terms of the bargain.")); *see also Cave II*, 2013 WL 1915660, at *5 ("Under the terms of the TPP, Saxon would only return an executed TPP to the borrower if the borrower was, in fact, qualified.").

27

The facts of this case are very similar to those in *Wigod*, where the court found plaintiffs stated a valid breach of contract claim sufficient to survive defendant's motion to dismiss.  As the *Wigod* court explained:

> Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo. . . .  Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine whether Wigod qualified.  If she did not, it could have and should have denied her a modification on that basis.  Instead, Wells Fargo countersigned on June 4, 2009 and mailed a copy to Wigod with a letter congratulating her on her approval for a trial modification.  In doing so, Wells Fargo communicated to Wigod that she qualified for HAMP and would receive a permanent "Loan Modification Agreement" after the trial period, provided she was "in compliance with this Loan Trial Period and [her] representations . . . continue[d] to be true in all material respects."

*Wigod*, 673 F.3d at 562.  The *Wigod* court also rejected the same proposition Saxon makes here, that the servicer did not have a contractual obligation to provide the plaintiff a permanent HAMP modification, but was entitled to review plaintiff's submission and either approve or deny the requested permanent modification.  The Seventh Circuit explained that such a position would make the existence of any obligation conditional solely on action of the servicer, and conflicted with other provisions of the TPP, including the servicer's promise to send the borrower a Modification Agreement if the borrower complied with the

obligations under the TPP and the borrower's representations continued to be true. *Wigod*, 673 F.3d at 563.  Wells Fargo's interpretation was suspect because it allowed servicers to avoid their obligations to borrowers merely by choosing not to send a signed Modification Agreement, even though the borrowers made both accurate representations and the required payments.  *Id.* ("Under this reading, a borrower who did all the TPP required of her would be entitled to a permanent modification only when the bank exercised its unbridled discretion to put a Modification Agreement in the mail.  In short, Wells Fargo's interpretation of the qualifying language in section 2 turns an otherwise straightforward offer into an illusion."); *see also Corvello v. Wells Fargo Bank, N.A.*, 728 F.3d 878, 883 (9th Cir. 2013) ("The more natural and fair interpretation of the TPP is that the servicer must send a signed Modification Agreement offering to modify the loan once borrowers meet their end of the bargain.").[8]

---

[8] Similarly, the court in *Cave II* concluded that "Saxon's theory that the TPP permitted it to determine whether Plaintiffs qualified under HAMP guidelines 'after the trial period began . . . conflicts with the plain terms of the TPP.'" *Id.*, 2013 WL 1915660, at *6 n. 5 (citing *Wigod*). The court explained that, unlike the instant TPP:

> [t]he *Cave I* TPP stated in Section 2.G. that "the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify." Similarly, Section 3 of the *Cave I* TPP stated that "[i]f . . . the Lender determines that I qualify, the Lender will send me a Modification Agreement."  The *Cave I* TPP thus permitted the servicer to determine, even after it signed and returned the TPP to the borrower, whether the plaintiffs qualified for permanent modification.  The instant TPP does not contain similar language, and, thus does not similarly indicate that Saxon had yet to qualify

The undersigned finds the Seventh Circuit's analysis both reasonable and persuasive. Plaintiffs here have sufficiently alleged a valid offer to provide a permanent modification agreement if they fulfilled their obligations. *See Brady*, 2012 WL 1900606, at *7 (agreeing with *Wigod* that "[b]y providing an executed copy to the borrower, the lender extends an offer and must provide a modification if the borrower complies with her obligations. . . . Michigan law is consistent with Illinois law on this point."); *see also Corvello*, 728 F.3d at 884 ("Where, as here, borrowers allege, and we must assume, that they have fulfilled all of their obligations under the TPP, and the loan servicer has failed to offer a permanent modification, the borrowers have valid claims for breach of the TPP agreement."); *Cave I*, 2012 WL 1957588 ("it is sufficient for a plaintiff to allege generally that all conditions precedent [for a permanent modification] were satisfied").

Saxon's reliance on *Pennington v. HSBC Bank USA, N.A.*, 493 Fed. Appx. 548 (5th Cir. 2012), and *Polk v. Countrywide Fin. Corp.*, 2012 WL 2952389 (E.D. Mich. July 19, 2012), is misplaced because those cases are factually distinguishable. In *Pennington*, the court found that plaintiff's allegations in her complaint that she would not have fallen behind in her mortgage payments absent

---

Plaintiffs for permanent modifications at the time it signed and returned Plaintiffs' TPPs.

*Id.* (internal citations omitted).

entering the loan modification process and the bank's demand that she quit making her regular monthly payments demonstrated her financial disqualification for a HAMP modification, because she cannot meet the financial-hardship requirement. *Pennington*, 492 Fed. Appx. at 553 ("Because financial eligibility is a condition for the TPP, Smith is not entitled to any benefits the TPP might provide."). That is not true in the instant case. More importantly, both the *Pennington* and *Polk* courts found it significant that the TPPs in those cases were not signed by the bank and returned to the borrower. *Pennington*, 493 Fed. Appx. at 554-55; *Polk*, 2012 WL 29523889, at *4. The *Pennington* court held that because the plaintiff did not allege that they received a signed copy of the TPP, the TPP never ripened into an offer and thus the plaintiff's breach of contract claim failed. *Id.* at 554-55 ("Provisions [in contracts] expressly requiring the agreement to be executed before it binds the parties are considered particularly significant."); *see also Polk*, 2012 WL 2952389, at *4 ("Defendant denied Plaintiff's request [for modification], Compl. ¶¶ 26-28, and it is undisputed that Defendant did not return an executed copy of the Trial Period Plan to Plaintiff" and therefore "Plaintiff's allegations fail to establish a breach of an enforceable contract"). Conversely, the TPP at issue here was signed and returned to plaintiffs, indicating that the parties intended to be bound by the agreement. *See Goss*, 2013 WL 6698041, at *5 ("By its plain terms, the TPP made clear that it is not binding until signed by CMI").

Plaintiffs also allege, in the alternative, that Saxon breached the TPP because it did not send plaintiffs a timely written denial, but instead led plaintiffs along in a trial modification for more than a year before advising them orally that they were denied a permanent modification.  (Dkt. 1, ¶¶ 64-66).  Saxon argues in response that it had no obligation to send a written denial.  The TPP provides that "the Lender will send me a signed copy of this Plan if I qualify for the Offer *or will send me written notice that I do not qualify for this Offer*."  (Dkt. 1-1). Moreover, this notification obligation is also set out in the applicable Treasury Directive:

> If the servicer determines that the borrower does not meet the underwriting and eligibility standards of the HAMP after the borrower has submitted a signed Trial Period Plan to the servicer, the servicer should promptly communicate that determination to the borrower in writing, and consider the borrower for another foreclosure prevention alternative.

(Dkt. 6-2, Pg ID 105, SD 09-01).  Plaintiffs alleged that Saxon failed to offer them a permanent modification within the period required by the TPP Contract or provide them a timely written notice of denial explaining why Saxon believed that plaintiffs did not qualify, but that Saxon instead strung plaintiffs along in a trial modification for more than a year without any guidance about their mortgage. (Dkt. 1, ¶¶ 64-66).  Thus, plaintiffs have sufficiently alleged a claim for breach of contract based on Saxon's failure to send them a timely written denial.  *See*

*Corvello*, 728 F.3d at 884-85 ("Wells Fargo's own failure to fulfill the notification obligation does not deprive plaintiffs of the benefits of their argument."); *Cave I*, 2012 WL 1957588, at *7 (complaint alleges that Saxon did not provide a written denial as to why plaintiffs did not qualify for permanent modification and thus adequately alleges that Saxon breached the TPP by not sending a written denial if plaintiffs did not qualify for permanent modification).

### 3.   Plaintiffs have adequately alleged consideration sufficient to support their breach of contract claim

Saxon argues that plaintiffs fail to allege adequate consideration to support a breach of contract claim, and that their partial payments of amounts due under plaintiffs' original note are insufficient because that was a preexisting duty under the mortgage.  "'Courts generally do not inquire into the adequacy of consideration to support a contract,' and even a 'cent or a peppercorn, in legal estimation,' would suffice." *Federal Deposit Ins. Corp. v. Fedorov*, 2010 WL 2944569, at *6 (E.D. Mich. July 22, 2010) (quoting *General Motors Corp. v. Dep't of Treasury*, 466 Mich. 231, 239; 644 N.W.2d 734 (2002)).  The undersigned suggests that plaintiffs have adequately plead consideration to survive defendant's motion to dismiss.  Plaintiffs allege that in addition to making trial period payments, the TPP Contract required plaintiffs to (1) provide extensive financial information that was not required under their original mortgages; (2)

make representations in a hardship affidavit concerning their personal circumstances; (3) make payments into newly established escrow accounts; and (4) undergo credit counseling if Saxon so requested.  (Dkt. 1, ¶¶ 63, 101).  Here, plaintiffs' allegations are sufficient to show that their promise was supported by consideration.  *See Wigod*, 673 F.3d at 564 (finding consideration in the plaintiff's agreement to "open new escrow accounts, to undergo credit counseling (if asked), and to provide and vouch for the truth of her financial information"); *Cave I*, 2012 WL 1957588, at *6 ("[T]he promise to undergo credit counseling upon request of Saxon constitutes consideration for Saxon's promise to provide Plaintiffs with a permanent loan modification or a timely denial."); *Fletcher v. OneWest Bank, FSB*, 798 F. Supp.2d 925, 931-32 (N.D. Ill. 2011) (rejecting defendant's argument that lower monthly payments were a windfall to plaintiff, because plaintiff "suffered some detriment" by incurring fees and likely having to pay a higher total amount in the long run).

### 4. Damages

Saxon also argues that plaintiffs inadequately allege damages because their alleged damages arise solely from their failure to make their mortgage payments and could have been avoided by plaintiffs paying the amounts due under their existing mortgage contracts.  Plaintiffs respond that they have pleaded sufficient damages, in the form of accrued fees and charges and damage to their credit

reports.  (Dkt. 1, ¶¶ 69-71, 109).  Specifically, plaintiffs' alleged damages include
"payment of increased interest, longer payoff times, higher principle balances,
deterrence from seeking other remedies to address their default and/or
unaffordable mortgage payments, damage to their credit due to improper negative
reporting to credit bureaus, additional income tax liability, inappropriate fees and
charges including broker price opinion fees, inspection fees, attorney's fees,
'process management' fees, and late fees, costs and expenses incurred to prevent
or fight foreclosure[.]"  (*Id.* ¶ 109).  Plaintiffs allege that if a class member
accepted a non-HAMP modification on terms that are less favorable than those of
a HAMP-compliant modification, their injury is measured by the difference
between the modification they accepted and the modification they were entitled to.
(*Id.* ¶ 110).  Or, if the class member had not been tendered a permanent
modification, their injury is measured by the difference between the current
circumstances and the terms of the modification they were entitled to.  (*Id.*).  The
undersigned suggests that plaintiffs' allegations sufficiently allege damages to
support their breach of contract claim.  *See Wigod*, 673 F.3d at 575 (rejecting trial
court's conclusion that the plaintiff had not shown any pecuniary loss and pointing
to the plaintiff's allegations that she "incurred costs and fees, lost other
opportunities to save her home [and] suffered a negative impact to her credit.");
*see also Fletcher*, 798 F. Supp.2d at 932-33; *Cave I*, at *8; *Cave II*, 2013 WL

1915660, at *8 ("If Saxon had provided Plaintiffs with permanent modifications, it is reasonable to infer that they would not have incurred, *inter alia*, increased principal, interest, and longer loan payoff times that accrued after the end of their trial periods, and may have sought other remedies to address their unaffordable mortgage payments.").

### 5.    Breach of the implied covenant of good faith and fair dealing

Saxon argues that the TPP is not an enforceable contract and thus there can be no breach of implied covenant of good faith and fair dealing claim because "Michigan does not . . . recognize a claim for breach of an implied covenant of good faith and fair dealing separate from an action on the underlying contract." *Burton v. William Beaumont Hosp.*, 373 F. Supp.2d 707, 718 (E.D. Mich. 2005). Plaintiffs respond that they have alleged a series of defendant's actions and omissions that undermined its ability to perform under the TPP and meet plaintiff's performance expectation, and that Saxon's unjustified failure to timely provide a permanent modification or a written denial deprived them of the expected fruits of the TPP and made it impossible for plaintiffs to know what was required of them at the end of the trial period.

"Michigan common law recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts."

36

*Burton*, 373 F. Supp.2d at 718; *Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 151-52; 483 N.W.2d 652 (1992) ("It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (citation omitted).  While Michigan does not recognize a common law cause of action for breach of the implied covenant of good faith and fair dealing, *Mernatti v. Nationstar Mortg., LLC*, 2013 WL 5587821, at *7 (E.D. Mich. Oct. 10, 2013) (citing *Fodale v. Waste Mgmt. of Michigan, Inc.*, 271 Mich. App. 11, 35; 718 N.W.2d 827 (2006)), every contract in which performance is left to a party's discretion is subject to an implied covenant of good faith.  *Lowe's Home Ctrs., Inc. v. LL & 127, LLC*, 147 Fed. Appx. 516, 523 (6th Cir. 2005); *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805, at *7-8 (W.D. Mich. Aug. 25, 2011)*.* "[W]here the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith." *Lowe's*, 147 Fed. Appx. at 523-24 (citing *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 334 n.23 (3d Cir. 2001) (distinguishing breach of contract based on bad faith in performance from independent tort action for breach of implied covenant of good faith under Michigan contract law))..

     Plaintiffs allege that Saxon routinely and regularly acts in bad faith and

breached its duties under the TPP for its own economic benefit by, among other things, failing to perform loan servicing functions consistent with its responsibilities to plaintiffs, failing to properly train and supervise its agents and employees implementing its modification programs, using unfair means to keep plaintiffs in trial periods of indeterminate lengths, making inaccurate calculations and determinations of eligibility for permanent modifications, making misleading offers that do not meet contractual obligations, failing to follow through on written and implied promises, and failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers. (Dkt. 1, ¶ 99). The undersigned suggests that plaintiffs have adequately alleged that Saxon breached its duties under the TPP in bad faith and Saxon's motion to dismiss plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should be denied and this claim should be permitted to proceed in conjunction with plaintiffs' breach of contract claim. *See Gallagher v. BAC Home Loans Servicing, L.P.*, 2012 WL 1952349, at *13 (W.D. Mich. May 30, 2012) (denying motion to dismiss claim for breach of duty of good faith and fair dealing regarding performance of loan forbearance agreement); *Darcy*, 2011 WL 3758805, at *7-8 (denying motion to dismiss breach of duty of good faith and fair dealing claim, because that claim "is dependent on the existence of contract duties, which is, in turn, dependent on resolution of ambiguities in the TPP contract" and "this claim

38

is permitted to proceed in conjunction with Plaintiff's breach of contract claim.").

Accordingly, plaintiffs have plausibly alleged that the TPP was an enforceable contract, that Saxon breached the TPP, and that plaintiffs were damaged by that breach. Therefore, Saxon's motion to dismiss plaintiff's breach of contract claim (Count I) should be denied.

### D.    Promissory Estoppel

Plaintiffs assert a claim for promissory estoppel in the alternative to their breach of contract claim. Plaintiffs alleged that the TPP promised that Saxon would modify plaintiffs' loan. Specifically, Saxon promised a determination no later than the Modification Effective Date, as specified in § 2 of the TPP, which reasonably induced plaintiffs to make modified payments. (Dkt. 1 ¶¶ 48-50, 63-68). Saxon argues, as it did with regard to plaintiffs' breach of contract claim, that the TPP does not include any promise to permanently modify the loan or provide a written denial, and that plaintiffs could not have reasonably relied on a promise that was never made.

The elements of promissory estoppel are:

> (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided.

*Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675; 599 N.W.2d 546, 552

(1999).  The promise must be "actual, clear and definite."  *State Bank of Standish*

*v. Curry*, 442 Mich. 76; 500 N.W.2d 104, 107 (1993).  Reliance is reasonable only

if it is induced by an actual promise.  *Id.*.

Plaintiffs have adequately alleged their claim of promissory estoppel.

Plaintiffs allege that Saxon made an unambiguous promise of a permanent loan

modification under HAMP if all trial period plan payments as set forth in the TPP

Contract were timely made and required documentation was submitted.  (Dkt. 1, ¶

114).  They also allege that they relied on Saxon's representations by making

monthly TPP payments and that their reliance was reasonable and justified.  (*Id.* ¶¶

115-17).[9]  Plaintiffs further allege that their reliance was to their detriment because

those who complied with the TPP contracts but were denied a permanent

modification have been required to pay increased interest, higher principal

balances, higher service fees, and extended payoff time periods, and they have

been deterred from seeking other remedies to address their default and/or

unaffordable mortgage payments, have incurred damage to their credit, costs and

expenses to prevent or fight foreclosure and other damages, and have been subject

_____

[9] The undersigned suggests that Saxon's signature on and return of the TPP to plaintiffs rendered plaintiffs' reliance on Saxon's promises reasonable.  *See Rummell*, 2012 WL 2564846, at *9 (citing *Wigod* for the holding that the bank's signature on and return of the TPP to plaintiff made the borrower's reliance reasonable); *Wigod*, 673 F.3d at 566 (finding that the complaint adequately alleged reliance based on defendant's promise to provide permanent modifications).

to additional income tax liability.  (*Id.* ¶¶ 118).  Therefore, defendant's motion to dismiss plaintiffs' promissory estoppel claim should be denied.

### E.    MCPA Claim

Plaintiffs allege that Saxon violated the MCPA by engaging in conduct that constitutes "unfair, unconscionable, or deceptive methods, acts or practices." (Dkt. 1, ¶¶ 125-27).  Saxon argues that plaintiffs' claim must fail because it is well settled that the MCPA "does not apply to residential mortgage transactions." *Brown v. Steel Capital Steel, LLC*, 2013 WL 765310, at *4 (E.D. Mich. Feb. 28, 2013).  Saxon asserts that the complaint alleges that Saxon engaged in the servicing of mortgage loans (Dkt. 1, ¶¶ 8, 10), and Saxon is a "licensed mortgage servicer" under the Mortgage Brokers, Lenders, and Servicers Licensing Act ("MBLSLA"), MCL § 445.1651 *et seq.*, which specifically authorizes licensed servicers to "engage in mortgage loan transactions."  *See Morris v. HomEq Servicing Corp.*, 2010 WL 537745, at *5 (Mich. Ct. App. Feb. 16, 2010) ("Likewise, because defendant is a mortgage loan servicer that is specifically authorized under the Mortgage Brokers, Lenders, and Servicers Licensing Act . . . to engage in mortgage loan transactions, subject to the supervisory authority and control of the Commissioner of the Office of Financial and Insurance Services . . . we find that defendant is exempt from the provisions of the MCPA.").

Plaintiffs respond that to establish the exemption, Saxon "must show that it

41

was specifically authorized to engage in the type of general transaction that is the gravamen of the complaint." *Gordon v. Home Loan Ctr., LLC*, 2011 WL 1261179, at *12 (E.D. Mich. Mar. 31, 2011). Plaintiffs contend that Saxon has failed to make the required showing here because it is not licensed to make deceptive and misleading statements, to provide TPPs and then fail to follow the requirements of those contracts, to deprive plaintiffs of information or take advantage of plaintiffs by charging them more than $5,000 in fees. However, the undersigned suggests that plaintiffs misconstrue the nature of the exemption. As the court explained in *Gordon v. Home Loan Center*, "[w]hen analyzing a claim of exemption, 'the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is "specifically authorized." Rather it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Gordon*, 2011 WL 1261179 at *12 (quoting *Smith v. Global Life Ins. Co.*, 460 Mich. 446; 597 N.W.2d 28, 38 (1999)). "Thus, to prove an entitlement to this exemption, a defendant must show that it was specifically authorized to engage in the type of general transaction that is the gravamen of the complaint." *Id.* As stated above, federal and state courts that apply Michigan law have repeatedly held that mortgage loan transactions are a type of "general transaction" that is exempt from the MCPA. *Id.* (collecting cases); *see also Brown v. Bank of New York Mellon*, 2011 WL 206124, at *7

(W.D. Mich. Jan. 21, 2011) (dismissing MCPA claims against defendants Bank of

New York and Saxon because the complaint alleged that they were engaged in

mortgage loan origination and servicing of mortgage loans, involving activities

specifically authorized by the laws under this defendants were regulated).  "Courts

have consistently held that defendants [such as Saxon] who are licensed under the

MBLSLA fall within this exemption."  *Gordon*, 2011 WL 1261179, at *12

(collecting cases).  Saxon has provided–and plaintiffs have not rebutted–that

Saxon was licensed as a First Mortgage Registrant under the MBLSLA and a

Secondary Mortgage Registrant under the Secondary Mortgage Loan Act.  (Dkt.

6).  Therefore, the undersigned suggests that Saxon is exempt from the MCPA and

plaintiffs' MCPA claim should be dismissed for failure to state a claim.

### F.    FDCPA Claim

Saxon asserts that plaintiffs' FDCPA claim fails as a matter of law because

Saxon is not a debt collector under the statute.  *See Mohlman v. Long Beach*

*Mortg.*, 2013 WL 490112, at *4 (E.D. Mich. Feb. 8, 2013) ("mortgage servicing

companies are not debt collectors").  Plaintiffs do not oppose the motion to

dismiss their FDCPA claim, and the undersigned agrees that this claim should be

dismissed.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that

defendant's motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**. The Williams plaintiffs should be dismissed as parties to this action, and plaintiffs' MCPA and FDCPA claims (Count III and IV) should be dismissed with prejudice for failure to state a claim.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 13, 2014                          s/Michael Hluchaniuk
                                                Michael Hluchaniuk
                                                United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on <u>January 13, 2014</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Joseph J. McDonnell, Jason R. Scherr and David G. Marowske.</u>

                                                s/Tammy Hallwood
                                                Case Manager
                                                (810) 341-7887
                                                tammy_hallwood@mied.uscourts.gov